NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

UNITED BRASS WORKS, INC.,
Respondent.

No. 8190.

United States Court of Appeals
Fourth Circuit.

Argued Nov. 7, 1960.

Decided Feb. 25, 1961.

Paul J. Spielberg, Atty., N. L. R. B., Washington, D. C. (Stuart Rothman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, and Melvin J. Welles, Atty., N. L. R. B., Washington, D. C., on the brief), for petitioner.

J. W. Alexander, Jr., Charlotte, N. C. (Blakeney, Alexander & Machen, Charlotte, N. C., on the brief), for respondent.

Before SOBELOFF, Chief Judge, BOREMAN, Circuit Judge, and BRYAN, District Judge.

BOREMAN, Circuit Judge.

This is a petition for enforcement of an order of the National Labor Relations Board directing the United Brass Works, Inc., to cease and desist from engaging in certain unfair labor practices, to reinstate with back pay certain employees said to have been discharged for union activity, to supply certain business records pertinent to contract negotiations, and to bargain in good faith with the union representing its employees. We are of the opinion that enforcement must be denied for the reasons hereinafter stated.

United Brass Works, Inc., hereinafter referred to as the company, opened its small metal fabricating plant in Randleman, North Carolina, in January 1958, employing local unskilled workers in a training program at a standard starting wage of $1.10 per hour, with increases as merited. Following union organizational activity among company employees starting in April 1958, a Board election was held on July 24, 1958, at which the employees selected the Sheet Metal Workers International Association, AFL-CIO, as their collective bargaining representative. This union was so certified on Au-

gust 1, 1958. The former employees, Robert E. York, Tommy Meyers and Buddy F. Robbins, allegedly discriminated against, had been continuously employed by the company since February and March 1958 and had engaged in the union organizational campaign.

In August and September of 1958, excessive inventories necessitated a reduction in the plant work force, and during this period the total number of employees was reduced from thirty-one to twenty-six. On August 29, 1958, employee York was discharged along with one other worker.[1] Thereafter, about September 11, 1958, a majority of the union members voted to strike in protest of alleged discrimination in the discharge of their fellow employees and during the ensuing strike period, September 11 to October 1, 1958, the company hired six new employees as permanent replacements for some of the strikers.

Upon charges duly filed by the union and the individual employees, a consolidated complaint was issued against the company and, following a hearing on March 24 and 25, 1959, the Trial Examiner concluded that the discharge of York was discriminatory within the prohibitions of sections 8(a) (1) and 8(a) (3) of the National Labor Relations Act;[2] that since Meyers and Robbins were striking in protest of the discriminatory and unjustified discharge of York, they had the status of unfair labor practice strikers and, hence, could not be permanently replaced; that in denying them reinstatement, the company was guilty of

a second unfair labor practice in violation of the above same sections of the act.

The company excepted to the findings of the Trial Examiner,[3] and upon review the Board affirmed the Trial Examiner's report and adopted his findings and conclusions. In arriving at his conclusion that the discharge of York was discriminatory and based upon his union membership and activity, the Trial Examiner stated that "[t]he *only* evidence offered by Respondent to establish the reason for York's selection for termination was that given by Fromberg," the company's production shop foreman, to the effect that the release was due to York's "attitude and (lack of) loyalty to the Company." (Emphasis supplied.) This evidence he discredited, stating that it had not been "given in a manner to convince me of its truthfulness."

It is not the function of a Court of Appeals in Labor Board cases to pass upon the credibility of witnesses. N. L. R. B. v. School-Timer Frocks, Inc., 4 Cir., 1955, 224 F.2d 336. However, where material uncontradicted evidence has been ignored, N. L. R. B. v. Cleveland Trust Co., 6 Cir., 1954, 214 F.2d 95, 98, or where evidence has been disregarded or eliminated by the casual expedient of discrediting an employer's witnesses, N. L. R. B. v. Miami Coca-Cola Bottling Co., 5 Cir., 1955, 222 F.2d 341, 345, the result is that the Trial Examiner's report and the Board's findings will not be accorded the presumption of correctness usually attributed to the trier of fact.

---

1. The Trial Examiner held that the Board's General Counsel failed to prove that the discharge of employee Baldwin on this date was discriminatory. The Trial Examiner also determined that another of the strikers, one Farabee, was denied reemployment for just cause. The Board affirmed both of these findings.

2. These sections of the act, as contained in 29 U.S.C.A. § 158 pertinently provide as follows:
 "(a) It shall be an unfair labor practice for an employer—
 "(1) to interfere with, restrain, or coerce employees in the exercise of the

rights guaranteed in section 157 of this title * * *.
 * * * * *
 "(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization * * *."

3. The company did not except to the Examiner's finding that it had engaged in unlawful interrogation of employees and surveillance of unionization activities. Hence that finding, as adopted *pro forma* by the Board, is not in issue in this proceeding.

N. L. R. B. v. National Paper Co., 5 Cir., 1954, 216 F.2d 859, 861–863; Local No. 3, United Packinghouse Workers of America v. N. L. R. B., 8 Cir., 1954, 210 F.2d 325, 330. See Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 496–497, 71 S.Ct. 456, 95 L.Ed. 456. Upon review of Board action we do not try the facts as a trial court nor do we review them as upon an appeal in equity or in law of a case heard without a jury, but it is nonetheless our duty to determine from the record as a whole whether substantial evidence to support the Board's decision and order is present and to deny enforcement if there is not. N. L. R. B. v. Southland Mfg. Co., 4 Cir., 1952, 201 F.2d 244.

At the time of York's discharge, it was undisputed that it was economically necessary that the company curtail production and reduce its work force. The Examiner himself found that "some reduction in staff was economically justified on August 29," 1958, the date of York's dismissal. This company had operated the same type of business before going to Randleman and it was undisputed that it was company policy, when effecting reductions in force, to give first consideration to comparative merit, taking into account ability, industriousness, aptitude, attitude and attendance, and if those considered for release were of equal merit then to apply seniority principles. There is no suggestion that this policy was adopted for discriminatory purposes or any other not in good faith. The sole question in selecting York for discharge was whether the company was acting upon York's performance record or because of his union membership and activity.

York himself admitted that he had been repeatedly reprimanded by his supervisors for being too slow in the performance of his work; for "spilling a barrel of stems"; for talking to such an extent that it interfered with his work; for spending excessive time in the rest room; for his "attitude" and "numerous" things like that; for insubordinate "talking back" and for "running [his] lip back to his foreman." Despite the fact that all other employees (with the exception of one Brigman), union and nonunion alike,[4] had received merit pay increases, York acknowledged that he had not. He conceded that, in response to his inquiries, his failure to receive an increase was uniformly attributed by his supervisors to the above noted deficiencies in his work performance. He further admitted that only twenty minutes before he was discharged he had been the object of yet another reprimand for spending too much time away from his work, and that he had responded with an insolent retort which we consider too vulgar to repeat.

This evidence, adduced from York himself, fully discloses that his job performance was frequently unsatisfactory and objectionable to his supervisors. Certainly, there is no evidence in the record to even suggest that any employee retained by the company had a poorer employment history and work record. York acknowledged that he was the thirty-first and last employee hired by the company and that he had no seniority over any other person.

Undoubtedly York was an active participant in the union organizational campaign. He had offered his home for several of the early meetings; he served as the union observer at the Board election; and he was a member of the union's contract negotiation committee (though he was later voted off of this committee by the union members). The

4. The evidence disclosed that one union president Farlowe, another union president Ferree, and yet another union president and assistant shop steward Cagle, together with active union members McKenzie, Robbins, Meyers, Farabee, Moore and Baldwin, had all received merit pay increases between February and the Board election on July 24, 1958. Some of these were granted within two or three weeks after the employees were first hired and some during the period of the union campaign.

company officials were well aware of York's union participation.

Indeed, neither York nor the Board has suggested that the frequent reprimands were undeserved or unjustified or that they were precipitated by an anti-union animus on the part of the company. But the effect of the Board's decision is that York's discharge itself was so motivated despite his past conduct and that his employment was terminated for reasons independent of his poor job performance. In a similar case, Martel Mills Corp. v. N. L. R. B., 4 Cir., 1940, 114 F.2d 624, 631, involving determination of an employer's motivation for the discharge of a union member, this court said:

"We do not lose sight of the fact that our inquiry is centered upon the motivating cause of the employer's action. The task is a difficult one. It involves an inquiry into the state of mind of the employer. Such inquiry is laden with uncertainties and false paths. Obviously our chief guide is the words of the witness under oath who undertook to disclose the workings of his mind. If his explanation is a reasonable one, the onus is upon the Board to establish the falsity of this explanation and the truth of its own interpretation. * * *.

* * * * * *

"* * * An examination of * * * the record makes it obvious that two separate explanations are advanced for Whittle's dismissal: the Martel Mills alleges that at the time of the general lay-off, it discharged an inefficient worker; the Board concludes that the Martel Mills seized the opportunity to discharge the employee because of his union activities. Aware of the burden of proof that is imposed upon the Board in proving the employer's dominant motivation in discharging the employee * * * we are of the opinion that the evidence advanced to support this finding of discrimination is not substantial.

"* * * Had the Martel Mills desired to discharge Whittle for his union affiliations, it could very easily have selected one of the occasions when Whittle had violated the company rules * * *. Instead, it allowed these complaints and disturbances to accumulate until a time when the record of the individual employee served as one of the bases for maintaining or discharging him. Whittle's record did not merit for him any favorable consideration. On the contrary, it gave indication that the employer would use the first convenient opportunity to rid itself of the undesirable employee. That Whittle was discharged instead of laid off does not evoke surprise or suspicion." 114 F.2d at pages 631, 632.

So it can be said in the instant case that York's employment record supplied good cause for discharge. The Company had abundant justification for terminating York as an unsatisfactory employee and, upon this record, one need go no further than the testimony of the discharged employee himself to discover the circumstances leading up to and motivating his release. That York was a union member and an active movant in the organizational drive will not shield him from release for good cause. Martel Mills Corp., supra, at page 633. If discrimination may be inferred from mere participation in union organization and activity followed by a discharge, that inference disappears when a reasonable explanation is presented to show that it was not a discharge for union membership. N. L. R. B. v. Stafford, 8 Cir., 1953, 206 F.2d 19, 23.

In determining that this evidence demonstrating good cause for discharge was overcome by a showing of discrimination, the Trial Examiner placed great emphasis on statements made to York by two company officials. One of these was uttered by Fromberg, the production shop foreman, in conjunction with one of York's several reprimands, to the effect that *no pay increase* had been forth-

coming because of York's "attitude and loyalty to the company." The Trial Examiner referred to this statement as being the "only" evidence of reasonable grounds for discharge. But it is clear that this was not the only evidence. We have previously noted that York's own testimony contained extensive evidence of just cause for release. Moreover, when this statement of Fromberg is examined in its full context, it becomes clear that the reference to attitude and loyalty was not an allusion to York's union membership but was expressive of his poor work performance.[5]

The second remark relied upon by the Trial Examiner to prove discrimination was one attributed by York to one Morris Mandelkorn, the company's plant superintendent, made in further explanation of Fromberg's second refusal to grant York a wage increase. Mandelkorn allegedly said that, *from information gathered from other employees*, he suspected York "was the union leader in the bunch," but that "if he [Mandelkorn] found out that I [York] wasn't the ringleader, that he would bring my pay substantially up with the rest of the boys, but if he found out that I was, and they

were telling the truth, that he would fire me." Mandelkorn absolutely denied having ever made any such threat and the only evidence thereof was that adduced from York himself. The Board, however, adopted the Trial Examiner's finding that this threat of dismissal for union activity had in fact been made.

█ Again acknowledging recognition of the rule as to a redetermination of the credibility of witnesses on appeal, we cannot overlook the further rule that a Trial Examiner's findings "are to be considered along with the consistency and inherent probability of testimony." Universal Camera Corp. v. N. L. R. B., 1951, 340 U.S. 474, 496, 71 S.Ct. 456, 469, 95 L.Ed. 456. Here, Mandelkorn's alleged threat was made on August 15, 1958, two weeks before York was discharged on August 29, 1958. Yet York stated that he had served as the union's observer at the July 24 Board election, had been elected to the union contract negotiation committee on that same day and had attended bargaining sessions of that committee on August 13 and August 20 prior to his discharge. The company officials, including Mandelkorn, testified that they knew of York's active participa-

5. Fromberg testified in part as follows:
"Q. What was the basis of your determination that it would be York and Baldwin who would be laid off?"

\* \* \* \* \*

"A. Basically the same determination I would use as to increases in pay, namely merit; the way he applies himself to his job, his ability, whether he has to be constantly watched and supervised, or whether he can be relied upon in performing his job, whether he abuses his privileges, and if necessary I might take the length of time that a man had been in the employment of the company.

"Q. How did York stand in that last respect? A. That is in length of service? I found out he had been the last man employed, but that didn't even enter into the matter, because he hadn't even warranted a raise.

"Q. Why hadn't he warranted a raise? A. Because of the lack of the things I just enumerated."

\* \* \* \* \*

"Q. Did you use any phraseology about loyalty or anything? A. Well, yes, at one time I told him that I didn't believe he was a loyal employee.

"Q. What did you mean by that? A. I told him that if I left my department for a while and came back, I would find him sloughing off on his job, whereas my other men would keep working; that if I weren't present, he would be sloughing off on his job, and that the men would keep working.

"Q. Do you have men whom you know were in the union and leaders of the union, working for you? A. Yes, I do.

"Q. Do you consider them loyal employees now? Would you consider them at all times loyal employees? A. Yes.

"Q. Did you consider since they have been there, as far as your terminology is concerned, did you consider them as loyal employees? A. Yes, one in particular, he needs very little day to day supervision, other than to be given specific instructions. Even today I have no doubt that he is doing his job, even though I am not there. \* \* \*."

tion in union affairs. Thus it is obvious that prior to and at the time of this alleged threat, Mandelkorn was fully aware of York's union activity and would have had no reason to check among other employees to obtain such information. If Mandelkorn had wanted to discharge York for union activity, he had both knowledge and opportunity five weeks before the date York was actually terminated. *Furthermore, it was not Mandelkorn but Fromberg who discharged York*, in the exercise of his discretion and authority.[6]

■ Mandelkorn's alleged threat applied not only to York but to one Brigman as well. Brigman, however, was never discharged and there has been no contention that he was ever subjected to any form of discriminatory treatment. Finally, York admitted Mandelkorn had never "checked back" on him. Moreover, we are not required to say that York's testimony in respect to the alleged threat has been discredited.[7] It is sufficient to say that we are unable to find any evidence to support the finding of the Board in this particular other than York's own self-serving declaration. Upon the whole record we determine that there is not substantial evidence to support a finding that York had ever been threatened with discharge, or that he was, in fact, discharged, because of his union membership or activity.

In respect to Meyers and Robbins, the Trial Examiner and the Board concluded that once it was determined York's discharge was discriminatory, those striking in protest thereof were unfair labor practice strikers and entitled, upon their request, to reinstatement in their former or similar positions. The strike in which Meyers and Robbins participated com-

menced on September 10, 1958, picketing ended on October 1, 1958, and on that day several union leaders returned to and were reinstated in their former jobs. By October 15 twenty-one employees were back at work, and between October 15 and October 24 all available jobs had been filled either by returning strikers or with permanent replacements. It was not until after this time that Meyers and Robbins requested reinstatement but they were refused on the ground that all jobs had been filled.

■■ While it is unquestioned that employees striking in protest of the unfair discharge of one of their number are engaged in a protected activity and, as unfair labor practice strikers, are entitled to reinstatement in their former or similar positions, N. L. R. B. v. Peter Cailler Kohler Swiss Chocolates Co., 2 Cir., 1942, 130 F.2d 503, if it be determined that the object of their protest was not in fact an unfair labor practice, reinstatement does not follow as a matter of absolute right.

In a similar situation, the Court of Appeals for the Ninth Circuit held:

"Had the strikers been correct in their assumption that Patton was discharged for union activities, the strike would have been an unfair labor practice strike. In that event the respondents [employers] could neither discharge nor replace them. * * * But since Patton was discharged for good cause the strike should be classed as an economic strike. As economic strikers the men who had walked out could have been replaced. See N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 345–346, 58 S. Ct. 904, 82 L.Ed. 1381. * * *."

---

6. The undisputed testimony of Mandelkorn was as follows:

"Q. Mr. Mandelkorn, did you have any thing to do with the layoff of York and Baldwin? A. Absolutely not. Only to the extent one of the department heads [Fromberg] told me he was overstaffed. So I told him to use his own discretion."

7. The Trial Examiner did not rule directly upon the obvious conflict in respect to this alleged threat by Mandelkorn. Instead of passing upon the credibility of the witnesses in this particular it was simply held, in reliance upon York's testimony alone and ignoring evidence to the contrary, that a prima facie case of discrimination had been established.

N. L. R. B. v. McCatron, 9 Cir., 1954, 216 F.2d 212, 215.

Since the company had filled the remaining positions vacated by the strikers with permanent replacements, with allowance made for those jobs eliminated in the reduction of the work force (see N. L. R. B. v. Mackay Radio & Telegraph Co., 1938, 304 U.S. 333, 346, 58 S.Ct. 904, 82 L.Ed. 1381, it was under no obligation to reinstate Meyers and Robbins.

Another issue presented is the decision of the Board that the company failed to bargain in good faith with the union, refused to furnish information on job classifications and wage rates, and unilaterally granted a wage increase in violation of sections 8(a) (1) and 8(a) (5) [8] of the National Labor Relations Act.

■ Although the Trial Examiner held that the evidence did not establish "that the totality of [the company's] conduct manifested an intention not to bargain in good faith," he concluded that the refusal to furnish the union "wage information" was a violation of the act. During the first contract negotiation meeting on August 13, 1958, one Bweler, the regional director of the parent union,

was refused data on the "wage rates of employees, and the job classifications." Ordinarily a refusal to supply pertinent information on wage rates and pay scales would be a clear instance of a refusal to bargain in good faith. N. L. R. B. v. Whitin Mach. Works, 4 Cir., 1954, 217 F.2d 593. However, the union's business agent, one Fie, who was present at this same bargaining session, described the nature of the desired information.[9] York who, along with Fie, represented the union during the negotiations, explained the nature of this request as it was repeated at the second bargaining session as shown below.[10]

■ The primary bargaining objective of the union relative to this request appears not to have been ascertainment of the pay scale but the *establishment* of job classifications and the definition of specific wage rates to be applicable to the various classifications once they were established. At the time of the negotiations, the company did not have job classifications but was shifting employees from job to job within the plant in pursuance of a training program. There were no specific wage rates for the different types of work, and each employee

8. This section of the act, contained in 29 U.S.C.A. § 158, provides as follows:
 "(a) It shall be an unfair labor practice for an employer—
 * * * * *
 "(5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title."

9. "Q. What information was this? A. Wage rates and job classifications of the employees in the bargaining unit.
 "Q. With respect to job classifications, what kind of information were you seeking to gain from the company? A. I had heard some of the men in the bargaining unit talking about lathe operators, some talk about assembly men, and I had heard some talk about shipping and receiving. So I figured that there must be some sort of classification, so that you could know a machine operator from assembly man, or a shipping and receiving man, or what have you, but the company refused to give us that information."
 * * * * *

"A. * * * I had attempted to set up job classifications for the purpose of arriving at what various people in the plant made * * * in order to get to some point of being able to negotiate wage rates of these people, I had listed some of the classifications."

10. "Q. * * * you asked them to break down the job classifications and establish wage rates for those classifications? A. We asked them if they would consider it, yes.
 "Q. And you asked them if they would give you the job classifications at that meeting, didn't you? A. Yes. They said no. He said no.
 "Q. He said he didn't have them? A. He said, no, he wouldn't give us job classifications, he said he didn't have them and he wouldn't give them to us.
 "Q. Well, he wouldn't give them to you because he didn't have them? A. Well, *we just asked for the job classifications*, and he said he didn't have any." (Emphasis supplied.)

was hired at a standard starting wage of $1.10 per hour with merit increases being awarded by the company without regard to the particular job in which the employee might then be working. It was the absence of a system of job classifications and wage rates for different job descriptions that gave rise to the union's request. The absence of such a pay practice likewise predetermined the company's "refusal." We need cite no authority for the proposition that an employer could not be required to accede to a request to furnish information which it did not possess.

During negotiations, when the subject of rates of pay (as opposed to the possible adoption of job classification rates) was introduced, the company representative stated that such data was in the custody of the company payroll clerk who was, at that time, out of town and unavailable for consultation. The union did not challenge the validity of this explanation. Furthermore, immediately thereafter, York himself recited the same information which had been collected by the union from the several employees' pay vouchers. When the company offered the wage data at the next bargaining session, Fie further stated that such information "didn't matter." Thus, the union rejected the only wage information the company possessed. We therefore conclude there is not substantial evidence to support the finding that the company refused wage rate information in order to hinder or impede the union's efforts to bargain.

The final issue is the finding that the company's grant of five cents per hour merit wage increase to seven employees after the termination of negotiations manifested a refusal to bargain with respect to wages. Although the company had followed a practice of awarding such increases from the commencement of its operations, the practice was suspended after the Board election on July 24, 1958, and no further such increases were granted throughout the period of contract negotiation. By October 1, 1958, substantial agreement had been reached on all issues except wages. The bargaining sessions up to this point had proceeded peacefully and constructively, union negotiator Fie being of the opinion that they had always been "cordial." The union, however, was insistent upon a standard "across the board" increase of five cents per hour for all employees, and the company contended it should be allowed to continue the past policy of granting merit increases on the basis of individual performance. At the conclusion of the October 1, 1958, meeting, the union retired from the negotiations and made no further effort to renew or reopen. On October 15, 1958, the company resumed its prior wage practices, granting each of seven employees a merit increase of five cents per hour.

 Unquestionably, merit pay increases are a proper subject for collective bargaining and a refusal to negotiate thereon would be a violation of the act. May Department Stores Co. v. N. L. R. B., 1945, 326 U.S. 376, 66 S.Ct. 203, 90 L.Ed. 145; N. L. R. B. v. Berkley Mach. Works & Foundry Co., 4 Cir., 1951, 189 F.2d 904; N. L. R. B. v. J. H. Allison Co., 6 Cir., 1948, 165 F.2d 766, 3 A.L.R.2d 990. In the instant case, however, both the union and the company engaged in extensive, albeit unsuccessful, bargaining on the issue of merit pay increases. The union has not contended that the company did not bargain in good faith on this issue. Nor is it claimed that prior merit increases were discriminatory or that those granted on October 15, 1958, were awarded on any basis other than individual employee merit. The increases were granted on the same basis as in the past and before the union certification. In every sense they were nothing more than a resumption of a former policy which had been the subject of a vigorous but deadlocked negotiation. We do not think that substantial evidence demonstrates that they were not granted in good faith, that they were "inconsistent with the principle of collective bargaining," or a "disparagement of the collective bargaining proceedings." See N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 224–225, 69 S.Ct. 960, 964, 93 L.Ed. 1320. The

company, having met its statutory obligation to bargain and negotiations having been terminated, was free to act in granting pay increases even in the absence of union approval. See N. L. R. B. v. Sands Mfg. Co., 1939, 306 U.S. 332, 59 S.Ct. 508, 83 L.Ed. 682; N. L. R. B. v. Andrew Jergens Co., 9 Cir., 1949, 175 F.2d 130.

In view of our stated conclusions that York, Meyers and Robbins are not entitled to reinstatement, that the company did not refuse to bargain with the union in good faith, that the company did not arbitrarily refuse to furnish information on job classifications and wage rates and that the granting of merit wage increases did not violate the National Labor Relations Act, enforcement of provisions of the Board's order relative thereto must be denied. Since the company stands guilty only of unlawful interrogation and surveillance in respect to union activity prior to the Board election on July 24, 1958, there is no apparent necessity for enforcement of the remaining provisions of the order. See N. L. R. B. v. Crompton-Highland Mills, Inc., 1949, 337 U.S. 217, 226, 69 S.Ct. 960, 93 L.Ed. 1320.

Enforcement denied.