**BENSON VENEER COMPANY, Inc.,
Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**No. 10446.**

United States Court of Appeals
Fourth Circuit.

Argued June 2, 1966.

Decided July 8, 1968.

Ernest W. Machen, Jr., Charlotte, N.
C. (Blakeney, Alexander & Machen,
Charlotte, N. C., on brief), for petitioner.

Elliott Moore, Atty., National Labor
Relations Board (Arnold Ordman, Gen.
Counsel, Dominick L. Manoli, Assoc. Gen.
Counsel, Marcel Mallet-Prevost, Asst.
Gen. Counsel, and Julius Rosenbaum,
Atty., National Labor Relations Board,
on brief), for respondent.

Before BOREMAN, BRYAN and J. SPENCER BELL, Circuit Judges.

ALBERT V. BRYAN, Circuit Judge:

This is a petition for review of an order of the National Labor Relations Board and a cross-petition by the Board for enforcement of its order.

On January 10, 1964, two company employees approached the United Brotherhood of Carpenters and Joiners of America and requested them to organize the plant. Several organizational meetings were held. On February 29 Marvin Britt, who was found to be a supervisor, was informed of the organization drive. On March 4, the union wrote to the President of the company claiming to represent a majority of the employees and demanding recognition and bargaining. The company ignored the letter. On March 9 the union petitioned the NLRB for an election. Shortly after receiving the union demand the company sent notices to its employees stating among other things the company's "sincere belief is that if the Union were to get in here it would not work to your benefit but, in the long run would itself operate to your serious harm" and stating the company's "intention to oppose the Union and by every proper means to prevent it from coming into this operation." At about the same time the President instructed his supervisors to observe and question the employees with regard to union activity. On April 29, the union made a second demand to be recognized. On March 4th the union had received signed cards from 26 employees, which did not represent a majority of the 56 workers in the unit. By March 24 the number of signed cards was up to 29. An election was scheduled for August 27th.

The interrogation of employees went past mere questioning as to union support. It included dire predictions that the owners would close the plant if the union succeeded and the intimation of surveillance by statements that the company had a list of those who attended union meetings and signed cards. During this period six men, including the two employees who had initially approached the union, were discharged, purportedly for cause.

On July 3, the company served a free barbecue lunch to its employees, and for the first time granted them a paid holiday on July 4th.

On the day prior to the election a meeting of employees was held at the courthouse, where four officials and business leaders of the town of Benson made speeches and threats to the employees as to the consequences of bringing unions to Benson. Earlier several employees had been visited in their homes by Benson businessmen who attempted to discourage their union activity.

While the election was in progress the top management of the company, contrary to their prior agreement as to the conduct of the election, roamed the plant releasing men to vote. There was a general atmosphere of company surveillance during the election. The union was defeated 26 to 15.

The Board, in agreement with the Trial Examiner, found that the company violated § 8(a) (1) of the Act by coercively interrogating its employees concerning their organizational activities, by engaging in surveillance and creating the impression that such activities were under surveillance by the company, and by threatening its employees that if they should select the union as their bargaining representative the company would close its plant and other serious harm might befall them. The Board also found that the reasons given by the Company for discharging employees were pretexts and that they were, in fact, discharged to discourage union membership, in violation of § 8(a) (3) and (1) of the Act. The Board further found that the company violated § 8(a) (5) and (1) of the Act by refusing to recognize and bargain with the union since April 29, 1964, (in any event no later than May 12, 1964) because the company was motivated, not by a good faith doubt as to the union's majority status, but by a desire to gain time in which to undermine the union.

The Board's order requires the company to cease and desist from the unfair labor practices found and from in any other manner interfering with, restraining, or coercing its employees in the exercise of their statutory rights. Affirmatively, the order requires the company to offer reinstatement to all six dischargees, to make them whole for any loss of pay suffered as a result of the discrimination against them, to bargain with the union upon request, and to post appropriate notices.

■ The company states that "one primary issue has been the focal point of this case from the beginning, and that is whether the Board has authority to confer bargaining rights upon a labor union that has failed to obtain the support of a clear majority of the employees, but has also been soundly rejected by the employees in an election conducted by the Board at the union's request." This contention is merely a rephrasing of the waiver doctrine, that when a union requests an election it waives the right to obtain recognition through the unfair labor practice procedure. This doctrine has been rejected by the Board. Bernel Foam Products Co., 146 N.L.R.B. No. 161, 56 LRRM 1039. If an election has been interfered with so as to make it a nullity, the union is not bound by its results and may proceed with its refusal to bargain charge. Four circuits have recently considered the question and uniformly supported the Board's position. Int'l Union of Electrical, Radio and Machine Workers v. N. L. R. B., 122 U.S. App.D.C. 145, 352 F.2d 361, 363 (1965); Irving Air Chute Co. v. N. L. R. B., 350 F.2d 176, 182 (2 Cir. 1965); N. L. R. B. v. Frank C. Varney Co., 359 F.2d 774 (3 Cir. 1966); Colson Corp. v. N. L. R. B., 347 F.2d 128, 138 (8 Cir. 1965).

■ The real question in this action is whether there was substantial evidence to support the Board's conclusion of interference with the election and whether there was substantial evidence of a union majority so as to entitle it to the bargaining order. We conclude the Board's finding as to the election was adequately supported, but that there was not substantial evidence of a union majority.

At the outset we state that the determination of credibility of the witnesses is within the province of the Board. N. L. R. B. v. Lester Bros., Inc., 301 F.2d 62, 68 (4 Cir. 1962). It is not the function of the court in Labor Board cases to pass on the credibility of witnesses, N. L. R. B. v. United Brass Works, 287 F.2d 689, 691 (4 Cir. 1961), and we must accept testimony credited by the Board.

There was substantial evidence to support the finding that Marvin Britt was a supervisor. He was paid substantially higher wages than other men in his department. He transferred employees between jobs within his department. And he reported to the management on the quality of work of men working with him. He therefore had "authority, in the interest of the employer" and exercised "independent judgment." 29 U.S.C. § 152(11). Having established that he was in fact a supervisor, it was proper to attribute statements made by him to the company. N. L. R. B. v. Taylor-Colquitt Co., 140 F.2d 92, 93 (4 Cir. 1943); N. L. R. B. v. Lozano Enterprises, 318 F.2d 41, 42 (9 Cir. 1963).

There is substantial evidence that the company engaged in coercive interrogation, surveillance and threats. In asking about union activity both Superintendent Woodcock and Marvin Britt indicated that the company would be closed if it were unionized. Britt admitted telling an employee that the company had a list of employees who had signed union cards or were involved with the union; he further told another employee that one of the union men must be keeping President Auman informed about it. President Auman agreed to "lend" one employee $5.00, after which that employee agreed to give information as to other employees' union activity.

There was substantial evidence to support the Board's finding that the six discharged employees were discharged to

discourage union activity. All were union supporters. Two were the employees who originally sought union organization. There is uncontradicted testimony that Superintendent Woodcock asked an employee if he would get other employees to repudiate the union and that if he did so then Woodcock would ask President Auman about reinstating the discharged employees. The contention that Auman, who made the discharges, had no knowledge of the employees' union activity is contradicted by the instructions which he gave to his supervisors to question the employees and determine the extent of union activity. At least in one case the company's reason for firing an employee of 5½ years standing for kicking a coke machine is not even plausible.

There was substantial evidence that the company interfered with the conduct of the election. It is admitted that high management officials called for employees to go to vote in violation of the agreed election procedure. Further it is not contested that the management was very obviously in the area of the polls.

On the record as a whole the conclusion by the Board, therefore, that the company unfairly interfered with the right of the union to organize and have a free election was supported by substantial evidence.

Satisfied of an unfair interference by the company with the election, the Board considered the accusation of the company's refusal to bargain. It declared the union had authorization cards from a majority of the employees as of April 29, the date of its second demand for recognition, and rejected the employer's avowal of good faith in doubting the union's claim. With these determinations we disagree.

■ The issue is twofold. Its first aspect is whether actually the union had attained a majority by April 29; the second is whether the company's denial was grounded in good faith. If the first was not provable, then the second inquiry need not be answered. As the Second Circuit said recently, "[L]ack of good faith doubt is immaterial if in fact no majority existed." N. L. R. B. v. S. E. Nichols Co., 380 F.2d 438, 442 (2 Cir. 1967). On the other hand, if the union had in truth been named by the more numerous workers, the company must negotiate with it, unless it could in good faith question its representation.

Turning now to the union's standing, this Circuit views with suspicion an assertion of majority status resting solely on authorization cards. In N. L. R. B. v. S. S. Logan Packing Co., 386 F.2d 562 (4 Cir. 1967), Chief Judge Haynsworth fully delineated the scope and reasons for our skepticism, saying:

"It would be difficult to imagine a more unreliable method of ascertaining the real wishes of employees than a 'card check', unless it were an employer's request for an open show of hands." Id. at 565.

The instant facts especially warrant incredulity. Even the claimed majority was narrow, so close, indeed, that it would disappear on finding a single card invalid. So thin an advantage creates only a bare expectancy, if any, of union victory at the polls.

Other circumstances suggest infirmities in the claim. The union made requests for recognition on March 4 and April 29. Pursuing a charge that the company inexcusably declined to bargain, the Regional Director reported that on neither date did the union represent the greater number of the employees. Later the Trial Examiner also found the union likewise wanting on the March 4 demand, possessing authorizations from only 26 of the 56 eligible employees. By April 29, however, the union had gained three more cards which, the Trial Examiner declared, made the requisite majority. The Board agreed but in this it looked askance at a warmly disputed card. Not until the Board treated the union's insistence as of a "continuing nature", and it garnered two additional cards on May 12 did the Board seem positive of the union's success.

The frailty of its case when seeking entry is thus revealed. Upon the first occasion clearly it could not speak for a major group of the Benson employees. On the second, its majority was merely one, including the contested card just mentioned. In stretching the April 29 claim to embrace cards signed on May 12, the Board seemingly indicated an unsureness in its declaration of a union majority on that day. Only on this scoring was the company returned as guilty of not bargaining. In the circumstances we cannot say that substantial evidence proved the union's appointment.

Furthermore, while we are not obligated to resolve the company's averment of a good faith doubt, nevertheless we do so because it demonstrates amain the error of the contrary finding and the proof is so readily at hand. The cards themselves—the union's entire dependence—give immediate ground for the company's disbelief, especially since they evidenced only a bare majority. In this we merely reaffirm what we held in N. L. R. B. v. S. S. Logan Packing Co., supra, 386 F.2d 562, 566:

> "An employer could not help but doubt the results of a card check as an indication of the wishes of employees, for there is nothing in the process to allay it. * * * If he has no honest doubt of the union's claim of support by a majority of the employees, it will be because of other evidence known to him, not because of the card check."

That the company committed 8(a) (1) violations upon receipt of the demand for recognition does not undercut the substantiality of its doubts. The distinction between permissible and illegal attempts by the company to assess the validity of a union claim of majority is extraordinarily fine, N. L. R. B. v. Dan River Mills, 274 F.2d 381, 388–389 (5 Cir. 1960), and we do not see the logic in branding the employer's queries as in

bad faith just because it loses its balance and oversteps the line.

So much of the Order as requires Benson Veneer to bargain with the Union will not be enforced; in its other portions it will be effectuated.

Order enforced in part, vacated in part.[1]

---

1. Judge Bell sat in the hearing of this case and was of the view that the Board's order should be enforced in toto. He died before the preparation of this opinion.