NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

HUNTINGTON HOSPITAL,
INC., Respondent.

No. 75–1890.

United States Court of Appeals,
Fourth Circuit.

Argued March 5, 1976.

Decided Jan. 5, 1977.

**922**

Charles P. Donnelly, Atty. N.L.R.B., Washington, D.C. (Michael S. Winer, Atty. N.L.R.B., John S. Irving, Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., on brief) for petitioner.

C. Robert Schaub, Huntington W. Va. (John E. Jenkins, Jr., Jenkins, Fenstermaker & Wood, Huntington, W. Va., on brief), for respondent.

Before CRAVEN, RUSSELL and WIDENER, Circuit Judges.

WIDENER, Circuit Judge:

The National Labor Relations Board has petitioned for enforcement of its order finding defendant Huntington Hospital, Inc., of Huntington, West Virginia (the Hospital), in violation of § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 151 et seq. (the Act), for threatening union supporters with discharge, and in violation of §§ 8(a)(1) and (3) of the Act, 29 U.S.C. §§ 158(a)(1) and (3), for discharging employees Chapman, Ross, and Patterson for their actual or suspected union activities. The Board's order requires the Hospital to offer Chapman, Ross, and Patterson reinstatement and back pay. We grant enforcement on account of the Board's findings of unfair labor practices for both the threats and the three discharges, but we deny in part enforcement of the remedy ordered in the cases of Ross and Patterson.

■ On August 19, 1974, the Union (District 1199, West Virginia, National Union of Hospital and Health Care Employees, AFL–CIO) instituted a drive to organize the custodial employees of the Hospital. A union organizer distributed leaflets and membership application cards to the employees as they reported for work, telling them about a new law enabling them to organize.[1] Two of the employees given this information were Kermit Chapman and Homer Ross. According to Ross' testimony before the Administrative Law Judge (ALJ), when he entered the hospital after receiving the leaflets, Executive Housekeeper Friend Buckner pulled the union literature out of Ross' pocket and asked Ross if he "really wanted it." Ross replied that he was "going to read it, anyway," and took the literature back. Although Buckner denied the incident, the ALJ credited Ross' testimony. Determining credibility of witnesses is within the province of the Board, and such judgments will not be disturbed by the reviewing court, *Benson Veneer Co. v. NLRB*, 398 F.2d 998 (4th Cir. 1968), unless they are not supported by substantial evidence on the record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

Although the Union's organizational drive resulted in only four to six membership application cards being returned, at least three of which were returned before the discharges, both Chapman and Ross completed the cards and returned them to the Union. Thereupon, the union organizer sent to Chapman and Ross three blank application cards each, with the request that they solicit additional signatures. Chapman distributed his three, and on the morning of August 29 he distributed Ross' three cards. Although Ross told other employees that he had signed an application card, he did not solicit additional signatures.

On the afternoon of August 29, Chapman, Ross, and Shannon Patterson were discharged. The Hospital's testimony was that it had received a telephone call indicating that Ross had a record of at least drinking and was not the type of employee a

1. The union organizer was apparently referring to the non-profit hospital amendments to the Act which were approved on July 26, 1974, and went into effect on August 25, 1974. Public Law 93–360, 93d Congress, S. 3203.

hospital would want. The Hospital's security officer called the local police to check on Ross and discovered he had arrests for drunkenness and driving while intoxicated, and was considered rowdy or dangerous when drinking. The Hospital was not told, however, that Ross had been convicted of a felony within the past 10 years. According to the Hospital, it believed that Ross had lied on his job application by answering "no" to the question "Have you ever been convicted of a crime in the past ten years, excluding misdemeanors and summary offenses?"[2] Robert Adkins, Assistant to the Director of the Hospital, was told by the Director to get rid of Ross and any other troublemakers and people whose work was not up to par. Adkins thereupon instructed Buckner to discharge Ross. According to the Hospital, Chapman was discharged because his work was haphazard and incomplete, and Patterson was discharged because he had consistently refused to wear his uniform trousers for two months or more. This testimony presented by the Hospital conflicted with the testimony given by Chapman and Ross, and the ALJ credited them over the Hospital's witnesses.

Chapman had been employed in the housekeeping department for approximately three years and was the most senior member of the 18 department employees. He had received two merit increases at Buckner's recommendation, the most recent of which was about two months prior to his discharge.

The version of Chapman and Ross, credited by the ALJ, follows.

On August 29, at about 3:00 p.m., Buckner directed Chapman to come into his office. As Chapman arrived, Patterson was leaving. Buckner told Chapman to turn in his keys, which Chapman did, and Chapman asked what was going on. Buckner replied that he was phasing out the ECD (Emergency Care Division) on the second floor.[3]

When Chapman expressed doubt that that was the real reason, Buckner responded "there's a few more little friends that was tinkering with the union." When Chapman requested a paper to show that he had been fired, Buckner told him to see Adkins. When Chapman met with Adkins and expressed doubt that he was being discharged because the ECD was being phased out, Adkins asked Chapman why he wanted a union in the hospital. Chapman said "why would anybody else want a union" and left.

Ross had worked in the housekeeping department for about two weeks. Before he was hired, he filled out a job application and was interviewed by Adkins in Buckner's presence. Ross testified that he told Adkins that he had been arrested a few times and was out on bond on a non-serious charge.[4] Adkins considered these minor, decided to give Ross a chance, and directed Buckner to hire Ross. Ross further testified that he was permitted to leave work once to go to court on the matter he mentioned in the interview. The Hospital admitted that Ross' work was good.

On August 29, at about 3:30 p.m., Buckner called Ross into his office, where he told Ross to turn in his keys because ECD was being phased out. When Ross asked if this meant he was fired, Buckner said he'd "better believe it." When asked the reason for the discharge, Buckner replied that Ross had been soliciting votes for the union all over the Hospital. Buckner also told Ross, "don't feel bad. I've got Shannon [Patterson] and Chapman, and I'm going to get a few more around here." Although Ross denied to Buckner that he had been soliciting, Buckner disagreed and said that Ross, Chapman, and Patterson had solicited all the employees and that "if they got the union in here, it would bankrupt the hospital." Buckner referred Ross to Adkins for his paycheck. While Buckner testified that Ross was fired for falsifying his job applica-

---

2. The police record as disclosed on this inquiry revealed no felony convictions in the ten-year period.

3. The ECD was phased out on October 1, 1974.

4. Adkins was not advised the non-serious charge was felonious assault.

tion, he admitted that he did not tell Ross this when he was fired, nor did they discuss the police record at that time.

Ross testified that he informed Adkins that he was fired by Buckner for soliciting votes, that Adkins disagreed and asserted that he was discharged for lying. When Ross denied that he had lied, Adkins retorted that everything he put in his application was a lie. The Hospital's security officer did not agree with Adkins' testimony that the union was not mentioned when Ross was discharged. He said that Ross told Adkins that he had heard that the "union got us fired." Neither Ross nor the security officer remembered Adkins answer.

Patterson had been employed in the housekeeping department for approximately a year prior to his August 29 discharge. Several months prior to that, Patterson had stopped wearing his uniform trousers, although he did wear his uniform shirt. He had been warned on several occasions, but stated that he could not afford a new pair of trousers, his old ones apparently having been torn. He also did not accept the Hospital's offer for an advance with which he could purchase the trousers because he could not afford to repay the advance. When Patterson reported to work on the afternoon of August 29, he was told that the Hospital had tolerated long enough his refusal to wear uniform trousers, and he was discharged. The following day, Adkins offered reinstatement of Patterson if he would wear the complete uniform, but Patterson did not agree to these terms, and he picked up his check the next day. This account was given by Buckner and Adkins and was uncontradicted. Patterson did not testify, having left with no forwarding address, according to general counsel.

The ALJ rejected this account as unpersuasive, in light of Adkins' testimony that Patterson was in need of hospitalization for his pregnant wife, which would be available to him as an employee of the hospital.

We affirm the findings of the Board that the Hospital unlawfully discharged employees Chapman, Ross, and Patterson because of their actual or suspected union activities. The evidence, credited by the Board, and not without support in the record as a whole, is too abundant to warrant discussion. We enforce the order of reinstatement and loss of earnings from August 29, 1974 to the date of reinstatement for Chapman, less his net earnings during the period. We deny in part enforcement of the remedy as to Ross and Patterson.

According to the record, the only testimony was that Patterson was offered reinstatement but rejected it. This evidence was uncontradicted. "[W]here material uncontradicted evidence has been ignored, . . . or where the evidence has been disregarded or eliminated by the casual expedient of discrediting an employer's witnesses, . . . the result is that the Trial Examiner's report and the Board's findings will not be accorded the presumption of correctness usually attributed to the trier of fact." *NLRB v. United Brass Works, Inc.*, 287 F.2d 689, 691 (4th Cir. 1961). We are of opinion that there was no substantial evidence to support the finding that the Hospital did not offer Patterson reinstatement. The Hospital, having once offered reinstatement, is released from the back pay obligation from the date the offer was rejected. *NLRB v. Betts Baking Co.*, 428 F.2d 156 (10th Cir. 1970). The requirement that Patterson wear uniform trousers did not make the offer conditional; it was consistent with the job requirements throughout the department. Any award of back pay must accordingly be limited to the period between Patterson's discharge and Patterson's rejection of the offer of reinstatement.

As to Ross, we are of opinion that, because of his criminal record,[5] the Hospital

5. Ross' FBI record shows a 1959 Dyer Act conviction for which he was sentenced to three years' probation, which was revoked in 1961 and a sentence of 15 months imposed; a Red

Man Act charge (apparently having to do with the regulation of homes of fraternal organizations) in 1961 which was dismissed for failure of the victim to prosecute; and the felonious

need not offer him reinstatement. The record indicates that the Hospital, although it called the police to check on Ross, was not aware of the details of his record until some time after the firing, perhaps at the hearing. It is inconceivable that, had it had full knowledge of Ross' record, the Hospital would have hired him, or would not have fired him. Accordingly, we deny enforcement of the Board's order of reinstatement and limit back pay to the period between the time of Ross' discharge and such time as the Hospital was fully apprised of the details of Ross' record, which should be ascertained at a back pay hearing. *East Island Swiss Products, Inc.*, 220 NLRB # 26, 1975–76 CCH NLRB ¶ 16,205 (1975).

Enforcement of the Board's order is accordingly granted in part, denied in part, and the case is remanded for proceedings not inconsistent with this opinion.

CRAVEN, Circuit Judge, concurring and dissenting:

I agree with my brothers that the findings of the Board that the hospital unlawfully discharged Chapman, Ross and Patterson because of concerted activity are supported by substantial evidence.

On the peculiar facts of the case, and because the respondent is a hospital, I also agree that the Board's remedy of reinstatement to Ross is too extreme. Sick people ought not be unnecessarily disturbed. Because they need peace and quiet, it seems to me a hospital may be more discriminating in the selection of employees than a factory or place of commerce. As documented in the majority opinion, Ross has a record as long as his arm, and more significantly for my concern, it is a record of violence, drunkenness and disorderly conduct. By concurring in the denial of reinstatement relief to Ross, I do not mean to participate in the establishment of any rule of law that convicts may lawfully be denied employment opportunity and are outside the pro-

tection of the labor laws, and I do not read the majority opinion as establishing any such doctrine.

My brothers deny relief to Patterson on the ground that Patterson was offered reinstatement but rejected it. The Board found otherwise. My brothers feel free to displace the Board's finding with their own because the testimony of management that Patterson was offered reinstatement is uncontradicted. They omit to say that Patterson had left the vicinity and could not be found. Our *Brass Works* language, relied upon by the majority, comes very close to a rule of the Fifth Circuit specifically rejected by the Supreme Court. In *NLRB v. Walton Mfg. Co.*, 369 U.S. 404, 408, 82 S.Ct. 853, 855, 7 L.Ed.2d 829 (1962), the Fifth Circuit test in reinstatement cases was said to be "that the employer's statement under oath must be believed unless there is 'impeachment of him' or 'substantial contradiction,' or if there are 'circumstances' that 'raise doubts' they must be 'inconsistent with the positive sworn evidence on the exact point.'" In rejecting such a rule, the Supreme Court noted that the examiner sees the witnesses and hears them testify while the Board and the reviewing court look only at cold records. The Supreme Court quoted favorably from a Second Circuit opinion as follows:

> For the demeanor of a witness "may satisfy the tribunal, not only that the witness' testimony is not true, but that the truth is the opposite of his story; for the denial of one who has a motive to deny, may be uttered with such hesitation, discomfort, arrogance or defiance, as to give assurance that he is fabricating, and that, if he is, there is no alternative but to assume the truth of what he denies."

It has always seemed absurd to me to suggest that I must believe Ananias so long as he is uncontradicted and to then fail to

---

assault charge in 1974. His Huntington police record with disposition not shown (he did not explain although present) is much more extensive and from 1966 to 1974 covers drunkenness (12); felonious assault (1); fighting, profanity

and drunk (1); drunk and disorderly and resisting arrest (1); resisting arrest, disturbing the peace and profanity (1); and driving while intoxicated (1), none of which are duplications of the FBI record.

consider why he may have been uncontradicted.

Stated differently, if reinstatement is an affirmative defense, surely the burden of proof to show an offer of reinstatement and thus stop the running of back pay is upon the employer. If that is correct, the Board may properly conclude that the employer failed to sustain that burden for the simple reason that the examiner did not believe the witness. A failure to find the fact in favor of one who has the burden of proving that fact does not, of course, depend upon substantial evidence, but instead, upon a want of credible evidence.

I would enforce the Board's order of reinstatement and back pay for Patterson. To do so is not unfair to the hospital. The Board represented to us in oral argument that the question of entitlement to reimbursement for back pay will be determined in a compliance proceeding. If Patterson never shows up, there is obviously no one to pay, and I should think that would be the end of it. If he does show up, I would have no objection to an instruction that the Board take his testimony and determine anew whether he had been offered reinstatement.