**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PATRICK PLAZA DODGE, INC., Respondent.**

No. 74–2078.

United States Court of Appeals, Fourth Circuit.

Argued April 11, 1975.

Decided May 13, 1975.

Modification Denied Aug. 8, 1975.

John F. Depenbrock, Atty., N. L. R. B. (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N. L. R. B. and Alan D. Cirker, Atty., N. L. R. B., on brief), for petitioner.

George V. Gardner, Washington, D. C. (Asa Ambrister, Gardner & Ambrister, Washington, D. C., on brief), for respondent.

Before ALDRICH,* Senior Circuit Judge, and BUTZNER and RUSSELL, Circuit Judges.

ALDRICH, Senior Circuit Judge.

This is a petition to enforce a multiple order of the National Labor Relations Board; —to bargain with the union;[1] to reinstate or make whole four named employees, and not to grant increases in benefits to discourage union activities.[2] Since we find the order unjustified in part, a considerable recitation of facts is called for.

Respondent Patrick Plaza Dodge, Inc., sells and services new and used cars, the former manufactured by Chrysler Corpo-

---

* Of the First Circuit, sitting by designation.

1. Local Lodge 598, International Ass'n of Machinists and Aerospace Workers, AFL–CIO.

2. Respondent does not contest this last aspect, conceding that there was evidence to support the charge. Because at first blush this admission would appear to damage its denial of evidence supporting the claim of wrongful discharges, we will deal with this in a footnote later.

ration. At the time in question, January, 1973, it had been in business some four years, heavily financed by Chrysler, and had twenty-two employees in its service department. The administrative law judge, all of whose findings were adopted by the Board, warrantably found that "during most of its entire existence [respondent] has been undercapitalized, inefficiently managed, and in a very poor, if not crucial, financial condition." At least so far as the service department was concerned the situation became particularly acute during the last two months of 1972. Many service employees were paid on a piece-work basis, but with a guaranteed weekly minimum. Productivity fell so far below this that on January 2 respondent cancelled the minimum. Another problem had been that Chrysler had been rejecting in substantial amounts, as insufficiently established, claims for work allegedly done on manufacturer's warranties. Since no charge had been made against the customer, denial of reimbursement resulted in a total loss.

For nearly a year respondent had requested a visit of a Chrysler representative to analyze its business and make suggestions. In response to this, representative Gill arrived on Tuesday, January 16, departing on Thursday. Thursday respondent's owner and manager, Kerns, also left on a trip. The next day Kerns telephoned Billings, respondent's service manager, to discharge six named employees in the service department. Following conversations with Billings [3] at the end of the day, the six were terminated.

Pausing here, a complaint was filed with the Board requesting reinstatement of five dischargees. There is no explanation why the sixth individual was not named. At the trial, one of the five conceded that he had voluntarily quit on being refused a raise. It further appeared that Hager, one of the remaining four, had been reinstated long prior to the charge. (However, he is involved to the extent of ten days' loss of pay.) The other three are Spangler, Morris and McDowell.

Subsequent to the discharges, on January 23 there was posted a notice of a small wage increase for service department employees, and some minor added fringe benefits. On January 29 Hager, at the request of fellow employees, was offered reinstatement. The following day a letter was received from the union representative stating that he held cards of fifteen members of the service department (as of January 19) and wished to negotiate. Respondent's lack of response led to the present proceedings.

The union activity concededly commenced on Wednesday, January 17 when Hager, Spangler and one Mitchell drove to the premises of a Ford dealer in a neighboring town whose service department was on strike, and asked for cards. Not having any, some, but not enough, were brought to the shop the next day. There was no evidence that the carrier was observed or recognized. In order to obtain more cards, an arrangement was made whereby Hager would meet someone at the supermarket. During the lunch hour Hager and several other employees, including the bookkeeper, who we will assume to be a supervisor, drove to lunch in a car. Hager stopped at the market, went to meet the Ford employees, and picked up the cards and put them in his pocket. Hager, who was General Counsel's first, and perhaps principal witness, testified that he concealed what he had done; that no one said anything, and that Allen, the bookkeeper, had no idea of what had transpired. Although this was not contradicted directly or indirectly (cards were first circulated, and that secretly, the next day), the judge found it "highly unlikely" that Allen did not perceive the nature of Hager's errand. This was the first of his inferences contrary to General Counsel's own evidence and factually unsupported. There was no evidence anywhere, unless it could be inferred

---

3. The judge made frequent reference to the fact that Billings said he was sorry to do this.

It will be a sad day if civility forms a basis of an unfair labor charge.

from pretextual discharges, warranting even an inference that respondent knew of union activity until January 30.

The judge's thinking was circular. First, he conceded that there was no evidence that respondent knew of the union activity, and that because of its financial problems there was reason to make discharges. He then concluded that the coincidence of the date was circumstantial evidence that respondent knew of the activity.[4] In emphasizing this coincidence the judge made no reference to the coincidence of the discharge with the visitation by the manufacturer's representative, Gill, of which more, post. He then concluded that the reasons for the discharges, first stated to be sufficient, were pretextual.[5]

▋ The best that can be said for such an analysis is that it fails to recognize the burden of proof. In the first place, the burden is on the Board to show that the employer had knowledge of the union activity, NLRB v. Shen-Valley Meat Packers, Inc., 4 Cir., 1954, 211 F.2d 289; NLRB v. Gotham Industries, Inc., 1 Cir., 1969, 406 F.2d 1306, 1310. This, or any other burden, cannot be satisfied by "suspicion or surmise." *Shen-Valley*, ante, at 292. When knowledge has been shown, or warrantably inferred, and even when there is evidence of anti-union animus, the Board must still affirmatively show that the discharges were improperly motivated. NLRB v. Consolidated Diesel Elec. Co., 4 Cir., 1972, 469 F.2d 1016, 1024–25; NLRB v. United Brass Works, Inc., 4 Cir., 1961, 287 F.2d 689. If in fact there was no cause for discharge, there may well be an inference that the assigned reason was pretextual. But when cause exists, the Board must show an "affirmative and persuasive reason why the employer rejected the good cause and chose a bad one." NLRB v. Billen Shoe Co., 1 Cir., 1968, 397 F.2d 801, 803. As the court said in Appalachian Electric Power Co. v. NLRB, 4 Cir., 1938, 93 F.2d 985, at 989, quoted in *Shen-Valley*, ante, at 293, "[E]vidence . . . which gives equal support to inconsistent inferences" is not enough. Were the rule otherwise, any employee who had been guilty of conduct warranting discharge could protect himself by openly engaging in union activities, and run for luck, a procedure well illustrated in *Billen*.

▋ In the case at bar, the employer was not even dependent on its own witnesses to prove the existence of cause; the reasons came from the dischargees themselves. Thus Hager had been told a couple of weeks before that he would "have to speed it up." "I'd say in the two months prior to the time he called me back, the first part of December, last part of November, even, I wasn't producing." [6] Hager not only admitted a slowdown as to himself, but said it had been general in the last two months as to the other employees.

Nor was Hager the only one. Spangler, called by General Counsel, stated on direct examination that the employees were supposed to punch a time clock, and agreed with Billings that he did not do it "all the time;" that one man would "punch a time clock for three or four men or something like that," and admitted that he had been spoken to from time to time for not "giving out enough work," although never to the point of thinking he would be fired. On cross-examination, however, he admitted that he

---

4. "Thus, but for the time of the events involved, it would appear that these facts alone establish a failure on the part of the General Counsel to make out a prima facie case." We know of no decision holding coincidence in time sufficient to make out a case. *See, e. g.,* Amyx Industries, Inc. v. NLRB, 8 Cir., 1972, 457 F.2d 904, 906.

5. In fairness to the judge, there entered in his thinking a disaffection for respondent's owner, Kerns. We do not find this supportive of his substantive conclusions. *See* n. 7, post.

6. Hager was, basically, a good worker, and was needed back. When respondent concluded to call him back he was told that he had spent too much time talking with Spangler, an obstacle now removed by Spangler's discharge. Hager testified that this had been true.

had been planning to go into business for himself, selling campers. "There have been people come into the shop and discuss camper work when customers were there." Q. "The fact that you were tired [from outside work] and more interested in getting your own business going than you actually were in hitting it hard on the line—could these have been factors?" A. "Yes sir, they could have been, yes."

Morris, whose duties were to prepare and test new cars, challenged on the stand with having done sloppy work, replied that when customers were in a hurry his instructions were to "throw the hub caps on" and give the car a wash. While questions of credibility are not normally for us, this excuse does not seem persuasive evidence for the General Counsel. Even more singular was the testimony of McDowell, whose duty it was to make out warranty work claims. Charged on cross-examination with improper work, he stated that this was because every day he was told to make out false claims. His supervisor, Billings, not unnaturally denied this, and the judge conceded that even Kerns seemed genuinely surprised. We thus have all four dischargees admitting improper work, General Counsel's only solace being that two of them claimed they had been told to do it.

The adequacy of the causes for discharge is further supported by respon-

dent's reasons for the timing, a matter to which the judge should have given, but in fact gave little concern. A reason concededly given by Billings to some of the dischargees was that they had "spilled their guts" to Gill. The judge felt it reflected on respondent not to have produced Gill. Quite apart from where the burden of proof lay, this was hardly necessary. Hager testified that he and Spangler talked at some length to Gill. "At that time we were aggravated and we'd tell him anything he asked." Q. "[B]eing in an aggravated state of mind, you of course answered all the questions and probably did you volunteer some other things he probably didn't ask you?" A. "I would imagine I did." While respondent had wanted a Chrysler representative to visit the plant, as the chief financier Chrysler was hardly one who it wanted to hear tales out of school by "aggravated" employees. It would be difficult to think of a better reason for a discharge.

On this record we have no hesitancy in holding that General Counsel failed to meet his burden of proving the discharges were improperly motivated.[7]

■ Turning to another subject, we are not impressed by respondent's Johnny-come-lately claim that the employees' cards, which was introduced in evidence without objection, were not genuine.[8] It is almost Johnny-come-lately for respon-

---

7. Two matters are perhaps worth an extended footnote. We suspect the main reason that the judge may have taken his eye off the ball was a manifested dislike of respondent's owner, Kerns. Even on the cold record it is difficult to be unsympathetic with the judge. From shuffling papers after being told not to, to continuous extensive and unresponsive answers, Kerns was a most unsatisfactory witness. We see no basis, however, for characterizing his testimony as "inherently implausible." At most, except for what is recited below, the inconsistencies were minor. Where the reasons for discharge were supported, the fact that to some extent he and Billings may have assigned different reasons does not mean that they were pretextual. Cf. Dubin-Haskell Lining Corp. v. NLRB, 4 Cir., 1967, 375 F.2d 568, at 573–74.

Secondly, we do not regard respondent's announcing new benefits on January 23 as evi-

dence that it knew of the unionizing. Respondent did know the employees were displeased by the cancellation of their guaranteed weekly minimum—they had complained to Gill about it. They had also remarked to Gill that the service department at Ford was on strike. In these circumstances it would be natural, albeit unwise, for respondent to try to take out a little insurance. We cannot say the judge was unwarranted in rejecting Kern's testimony that he had decided to make these changes when he terminated the weekly minimum three weeks before. But from that disbelief the Board cannot make out a whole case.

8. Even if the cards of the four dischargees, and the one who quit are disregarded, with six less employees, i. e., sixteen, ten cards was a clear majority.

 

dent to make an issue as to the appropriateness of the unit. If it is true that such assumption has never been effected under the rule of NLRB v. Gissel Packing Co., 1969, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547, at the least a respondent should offer some plausible reason why the unit was improper. We think of none here.

The order to bargain, and not to grant unlawful increases, is to be enforced. The order to reinstate and compensate the dischargees is vacated.

## ON PETITION TO MODIFY OPINION

### PER CURIAM.

The Board moves for a modification of the opinion by striking out the following two sentences.

> "[E]vidence . . . which gives equal support to inconsistent inferences" is not enough. Were the rule otherwise, any employee who had been guilty of conduct warranting discharge could protect himself by openly engaging in union activities, and run for luck, a procedure well illustrated in *Billen.* Its position is the general one that where two inferences can be drawn, the court is not warranted in concluding that the Board's inference is the less reasonable. No one questions that proposition. Our opinion addressed itself to the more restricted situation, also well known, where it cannot be fairly said that evidence warranted a particular conclusion as distinguished from the opposite.

Evidence that points equally in two directions points in neither, and therefore cannot satisfy the burden of proof. The defect cannot be cured by the alleged right of the trier of fact to draw inferences and make selections. A familiar example is the principle that the legislature cannot establish a presumption of fact upon evidence that is equally consistent with the opposite conclusion. *United States v. Romano*, 1965, 382 U.S. 136, 86 S.Ct. 279, 15 L.Ed.2d 210, with which compare *United States v. Gainey,*

1965, 380 U.S. 63, 85 S.Ct. 754, 13 L.Ed.2d 658. We reiterate that the Board cannot meet its burden of showing a wrongful motive for a discharge without having something affirmative to point to. This is in no way contrary to *NLRB v. Walton Mfg. Co.*, 1962, 369 U.S. 404, 82 S.Ct. 853, 7 L.Ed.2d 829, on which the Board would rely.

The petition for modification is denied.