**AMERICAN THREAD COMPANY, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 79–1362.

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1980.

Decided Sept. 26, 1980.

---

David M. Vaughan, Atlanta, Ga. (David C. Hagaman, Elarbee, Clark & Paul, Atlanta, Ga., on brief), for petitioner.

Lee W. Jackson, N.L.R.B., Washington, D.C. (Norton J. Come, Acting Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., on brief), for respondent.

Before WIDENER and SPROUSE, Circuit Judges, and HADEN, District Judge *.

HADEN, District Judge:

The Petitioner, American Thread Company, has petitioned to review and set aside, and the National Labor Relations Board has cross–petitioned to enforce, an order of the Board finding that Petitioner violated Section 8(a)(3) and (1) of the National Labor Relations Act [1] by discriminatorily discharging its employee, Mike Lee Sparks. We grant enforcement.

The law applicable to this case is clear and settled; resolution turns on the facts. Accordingly, we give fairly extensive discussion to the record evidence.

Prior to his discharge on December 7, 1977, Sparks had been employed for eleven years as a truck loader in the receiving department of Petitioner's Sevier Plant in Marion, North Carolina. In Petitioner's view, Sparks was a "good" employee. Nevertheless, Sparks' personnel record was not without blemish; he had been orally disciplined three times. Sparks had been warned on two occasions in 1977 for leaving his work area prior to the shift–end buzzer. On April 8, 1977, he had been warned for passing out union cards on company time in

violation of Petitioner's policy regarding solicitation. He denied having done so.

Petitioner historically was opposed to union organization of its employees,[2] as union organization at the Sevier Plant resulted in an election in June, 1972, won by the union, but subsequently set aside due to "irregularities." A second election was held in September, 1972, and Petitioner prevailed. Sparks supported the union in the 1972 campaign by soliciting 15 to 20 employees to sign union authorization cards, and also by his attendance at union meetings. Employer knowledge of Sparks' 1972 activities was manifested when Plant Manager Bill McBee asked Sparks, shortly after the June, 1972, election, whether he had "voted right" and also by conversations initiated by McBee, and another supervisor, Charlie Duncan, concerning Sparks' attendance at the union's "victory party."

The record contains no evidence of union activity from 1972 until the spring of 1977 when some brief and unsustained activity occurred. It was on April 8 that Sparks received an oral warning from his immediate supervisor, Joe Biddix, for violating Petitioner's no solicitation rule. This action was recorded in Sparks' personnel file. Approximately three weeks later Sparks was asked by Plant Manager McBee if he was "for the union" and Sparks stated he was not.

As noted by the Administrative Law Judge, the circumstances surrounding Sparks' discharge are not in significant dispute. At approximately 8:30 a. m., on December 2, 1977, Sparks, having completed unloading two trucks and preparing to unload a third, heard the call of nature. In-

---

* Charles H. Haden, II, United States District Judge, Northern and Southern Districts of West Virginia, at Parkersburg, sitting by designation.

1. 29 U.S.C. 158(a)(3) and (1).

2. Record evidence of this union opposition is as follows: Petitioner's employee handbook; the testimony of Wade Bowman, Industrial Relations Manager for the Sevier Plant; and a statement made in a speech to employees by

Max Poore, Petitioner's Southern Director of Industrial Relations, to the effect that unions "cause trouble". Of course, as the Administrative Law Judge who heard the evidence correctly noted, Petitioner's position "unaccompanied by threats, promises or coercion would not support a finding of [anti–] union animus warranting an inference of a willingness on the part of [Petitioner] to resort to discriminatory discharges in violation of Section 8(a)(3)." App. 24.

stead of proceeding approximately 150 yards to the men's restroom, he went outdoors to the back of the plant where two other employees, Chesley Glenn and Norman Dale, were sitting in a parked trash truck. After exchanging a few words with them, Sparks walked to a location between the trash truck and an adjacent vehicle owned by the plant's food service concessionaire, Robert Ayers, and believing himself to be concealed from the view of others, began urinating on the lot. Glenn and Dale, fully aware of Sparks' conduct, determined to play a "joke" on him, and so called over a young female employee of Robert Ayers, Tammy Carpenter. Carpenter approached Glenn's vehicle whereupon Glenn stated, "What's the matter with Sparks?" Carpenter then noticed Sparks apparently relieving himself, responded with an expletive directed at Glenn and walked away. Sparks' back was directed toward Carpenter, Glenn and Dale.

Later, Glenn shared the "joke" with his supervisor, Willard Hollifield, who then informed Joe Biddix of the occurrence. Biddix reported the incident to Assistant Plant Manager Bill Henline and it was decided that Sparks should be suspended. Upon confrontation by Biddix, Sparks did not deny the incident, but stated that his back was turned toward "the lady." Sparks was then suspended by Biddix.

During the three day suspension, Wade Bowman investigated the incident by talking with Glenn and Dale but not with Sparks or Carpenter. After consulting with Biddix, Henline and Poore, Bowman decided to discharge Sparks. When Sparks returned to work after the termination of the suspension on the morning of December 7, he was informed of the decision. Although not denying his action, Sparks reiterated that no one had actually seen him do it. The stated ground for discharge was "indecent conduct."

Although acknowledging that Glenn's and Dale's actions in purposefully involving Carpenter constituted indecent conduct within the meaning of Petitioner's "indecent conduct" rule, Bowman nevertheless imposed no discipline of any kind upon either employee.[3] Bowman excused the conduct of Glenn and Dale because he ". . . did not see any reason for them to be disciplined in any way because they had thought of it as a joke . . ." and further, he ". . . did not think it was severe enough for there to be disciplinary action." App. 53.

Bowman testified that urinating outside the plant, but on the premises, clearly was indecent conduct meriting discharge. Petitioner's evidence suggested that Petitioner viewed such conduct as a very severe transgression, and that management had instructed maintenance department employees, several years prior to 1977, that the conduct was prohibited.[4] As the Board noted, Petitioner never had taken any specific action to identify or punish previous transgressors. Additionally, three employees testified that it was not uncommon for employees to urinate on the outdoors plant premises. There is no conflict, however, that Sparks was the first and only employee known to management to have done so.

---

3. Petitioner's personnel policy, as explained in the "Employee Guide", and as testified to by certain supervisors, provided for progressive degrees of discipline with discharge to be used only as a last resort. Certain specified infractions were designated as meriting immediate discharge, but indecent conduct was not one of the offenses so specified.

4. The record is devoid of any evidence that employees were ever informed, orally or by written notice, that this specific conduct would result in immediate discharge in lieu of lesser sanctions. The record contains an affidavit of Chesley Glenn given during an interview with the "company lawyer", dated January 23, 1978, which stated: "I know that the type of indecent conduct engaged in by Mike Sparks would be grounds for discharge." App. 199. Glenn subsequently testified that he did not believe that Sparks' conduct merited discharge and when Petitioner's counsel attempted to impeach him with the affidavit, Glenn testified that the company lawyer phrased the above quoted statement and that Glenn acquiesced in the correctness of the statement because he "was under pressure and [he] thought that they would fire [him] because [he] was just as guilty as Mike Sparks was." App. 95.

The ALJ considered the legitimacy of Sparks' discharge as "highly suspicious" particularly because of "the minor nature of his offense when weighed in terms of the value of his services as a good employee for more than eleven years." App. 19–20. The ALJ found in favor of Petitioner, however, because in his view the general counsel simply had failed to carry his burden of proof. This conclusion was founded primarily upon the established and concededly legitimate basis for discipline by Petitioner, as well as the remoteness in time of the union activities from the date of discharge. Upon review, the Board interpreted the facts differently, and reversed. 242 NLRB No. 10 (1979).

 The sole issue before the Court is whether the Board's decision is supported by substantial evidence on the entire record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This standard on review is not altered because the Board drew different inferences and legal conclusions from the evidence than did the ALJ. *Universal Camera, supra*, at 493–494, 71 S.Ct. at 467. The Board, not the ALJ, is ultimately vested with the responsibility for determining whether an unfair labor practice has been committed. *Universal Camera, supra*, at 492, 71 S.Ct. at 466; *Florida Steel Corp. v. NLRB*, 601 F.2d 125, 129 (4th Cir. 1979); see 29 U.S.C. § 160(c). The Board is bound to give great deference only to the ALJ's findings which are based upon determination of the credibility of the witnesses. The ALJ's other findings and conclusions are part of the record, and while the Board is not free to disregard them, those findings and conclusions are entitled only to such weight as they intrinsically and reasonably command. In this respect, we recognize that the Board drew different inferences and conclusions from the evidence as found by the ALJ, and did not, in any significant particular, ignore or conclude contrary to those findings of the ALJ premised upon credibility of the witnesses.

 The law applicable to this action is well settled. In *NLRB v. Consolidated Diesel Electric Co.*, 469 F.2d 1016, at 1024 (4th Cir. 1972), we stated:

"A discharge, whether the cause be good or bad, and whether it be deemed harsh or lenient discipline, offends the Act *only* if discriminatorily motivated on account of union activity, or, to state it another way, there must be an unlawful intent in the discharge. And the burden of establishing such discriminatory or unlawful intent, it is settled, falls on the General Counsel."

And, where there is evidence of a nondiscriminatory ground for the discharge, as well as evidence suggesting the discharge was discriminatory, the rule applicable in this circuit is equally well settled: an employer violates section 8(a)(3) if the discriminatory motive was "a factor in the employer's decision" to discharge. *Neptune Water Meter Co. v. NLRB*, 551 F.2d 568, 569 (4th Cir. 1977); *NLRB v. Hanes Hosiery Div., Hanes Corp.*, 413 F.2d 457, 458 (4th Cir. 1969); *Winchester Spinning Corp. v. NLRB*, 402 F.2d 299, 304 (4th Cir. 1968); *Filler Products, Inc. v. NLRB*, 376 F.2d 369, 377 (4th Cir. 1967). In other words,

". . . an unfair labor practice may be found only if there is a basis in the record for a finding that the employee would not have been discharged, though he may have been subjected to a milder form of punishment for the offense, except for the fact of his union activity."

*Neptune Water Meter Co., supra*, at 570.

There is no dispute that Sparks' conduct merited discipline. The general counsel contended and the Board so found, however, that the employer discharged Sparks because of his union advocacy, and that the proffered "indecent conduct" justification was pretextual.

 The burden of proof placed upon the general counsel is clear:

"[W]hen an employer demonstrates . . . that it had a good ground for the discharge of an employee apart from any anti–union animus or activity, it is not sufficient to establish a violation of the Act for the Board to declare that the discharge was 'pretextual.' . . .

'when good cause for . . . discharge appears, the burden which is on the Board is not simply to discover some evidence of improper motive, but to find an affirmative and persuasive reason why the employer rejected the good cause and chose a bad one.'" *Firestone Tire and Rubber Co. v. NLRB*, 539 F.2d 1335, 1337 (4th Cir. 1976) (citations omitted).

Moreover, "'[E]vidence . . . which gives equal support to inconsistent inferences' is not enough". *NLRB v. Patrick Plaza Dodge*, 522 F.2d 804, 807 (4th Cir. 1975).

■ Thus, the general counsel and Board do not satisfy this burden merely by: proof that the discharged employee was a union adherent, *see Firestone Tire, supra*, at 1337; *Consolidated Diesel Electric Co., supra*, at 1024; *Martel Mills Corp. v. NLRB*, 114 F.2d 624, 631 (4th Cir. 1940); nor even by proof of the employee's union adherence as well as the employer's general anti–union bias. *Neptune Water Meter, supra*, at 570; *see Florida Steel Corp., supra*, at 132 (Slip Opinion 17). Generally, the inference of discriminatory motive arising from the discharge of a union adherent "disappears when a reasonable explanation is presented to show that it was not a discharge for union [adherence]." *NLRB v. United Brass Works, Inc.*, 287 F.2d 689, 693 (4th Cir. 1961); *Torrington Co. v. NLRB*, 506 F.2d 1042, 1047 (4th Cir. 1974); *Neptune Water Meter, supra*, 571 (Russell, J., dissenting). There must be some affirmative proof of unlawful intent; *Patrick Plaza Dodge, supra; Firestone Tire, supra*; or some "causal link" between the employer's anti–union attitude and the union adherent's discharge. See *Florida Steel Corp., supra*, at 132 (Slip Opinion 17). Simply put, these principles mean that union adherence or membership alone will not serve to shield an employee from discharge for just cause. *E. g., Neptune Water Meter, supra*, 569; *Firestone Tire, supra*, 1337.

Whether the employer acted with unlawful intent is a question of fact to be determined by the Board, considering all the circumstances of each case, and considering direct as well as circumstantial evidence. The resolution of conflicts in the evidence, and inferences to be drawn therefrom, are left solely to the Board. See, *e. g., J. P. Stevens v. NLRB*, 406 F.2d 1017 (4th Cir. 1968); *NLRB v. Lester Bros., Inc.*, 337 F.2d 706, 708 (4th Cir. 1964). Finally, this Court is bound to affirm the Board's decision if it is supported by substantial evidence on the whole record. The application of these principles was aptly stated by the Court in *Torrington Co., supra*, at 1047:

"The crux of the matter is that the Board, after discounting all explanations offered by an employer for a discharge . . ., must find unlawful motivation through substantial direct or indirect evidence. Substantial evidence means 'evidence furnishing a substantial basis of fact from which the fact in issue can reasonably be inferred; and the test is not satisfied by evidence which merely creates a suspicion or which amounts to no more than a scintilla or which gives equal weight to inconsistent inferences.'"

Applying these principles to the case at bar, we find that the Board's decision is supported by substantial evidence. Without question, Petitioner established a legitimate, nondiscriminatory reason to discipline Sparks. Nevertheless, several critical facts established a basis from which the Board reasonably could draw inferences that Petitioner acted with unlawful intent. The cumulative effect of these inferences adequately supported the Board's conclusion.

Preliminarily, we note that the evidence unequivocally demonstrated: (1) Petitioner opposed union organization of its employees; (2) Sparks actively supported union organization attempts in 1972 and again, to an unspecified extent, in 1977; and (3) Petitioner was fully award of Sparks' union activities. It is against this factual backdrop that the Board considered the evidence discussed below.

First, the Board inferred unlawful intent from the severity of the discharge sanction, applied to an admittedly "good" employee [5]

---

5. Evidence, in addition to that previously discussed, demonstrating Sparks' quality as an

employee was the statement by Joe Biddix to Sparks shortly after the suspension that Biddix

with eleven years service to the Petitioner.[6] Of course, as previously recognized, the choice of discipline is the sole prerogative of management. But the imposition of the ultimate form of discipline upon a valued employee certainly is relevant evidence which the Board properly may consider. There is no evidence that Petitioner ever considered the use of lesser sanctions; on the contrary, it swiftly concluded to invoke the "last resort" sanction. Moreover, the discharge decision was made after cursory investigation of the incident. From the outset, Sparks never denied his conduct, but Petitioner concluded to discharge without attempting to allow Sparks to explain the context of his impropriety.

The Board also inferred unlawful intent by comparing the severity of the discharge sanction to the nature and degree of the offense committed. The Board concluded that Petitioner evidenced a "lack of concern . . . when similar use was made of the area behind its plant in the past . . . ." App. 37.

Petitioner argues that the transgression was most serious, and, as the record proves, when the problem arose on past occasions, the appropriate management personnel instructed their employees that such conduct was prohibited, and also posted a notice to that effect. App. 161–179. Those incidents occurred several years prior to Sparks' discharge, and whether the actions taken by management solved the problem, from management's perspective, is not clear from the record. The evidence does demonstrate that: management never took specific action to identify or punish violators of the rule; employees never were expressly informed that a single violation of the rule necessarily would result in discharge; some

undetermined number of employees continued to urinate on the outdoors premises; and Sparks was the first employee ever known to management to have violated the rule.[7]

In our view, the evidence most probative of Petitioner's unlawful intent is the disparity of treatment accorded Sparks and that accorded Glenn and Dale. As Sparks was guilty of indecent conduct by urinating outdoors, so too were Glenn and Dale guilty for playing their "joke." That much was freely conceded by Wade Bowman. Nevertheless, neither Glenn nor Dale suffered any punishment whatsoever, while Sparks was swiftly fired. The Board was not required to credit Bowman's after the fact rationalization of this glaring disparity.

In determining whether the Board's decision is supported by substantial evidence, we must also consider that evidence which fairly detracts from the Board's decision. *Universal Camera, supra*, at 488, 71 S.Ct. at 464. In this respect we note that Petitioner's most forceful arguments are: (1) that if Petitioner's decision was motivated by anti–union animus, then logically Petitioner would have pretextually rid itself of Sparks years earlier; and (2) that Petitioner discharged Sparks solely for good cause, and that the Board absolutely failed in proving that the discharge was pretextual.

The timing of the discharge is not fatal to the Board's decision. Until 1977 Sparks' employment record apparently was flawless, and thus Petitioner was lacking a pretext to discharge him until that time. Of course, Petitioner presumably could have completely fabricated a pretext. On the other hand, Petitioner undoubtedly was cognizant of the possibility of renewed organization efforts and the further possibili-

---

hated "this so bad he could cry if it would do any good" App. 17; 119; that Sparks was the "best operator in the mill" and that "if it [knowledge of Sparks' act] just hadn't got into the hands of the wrong people . . . he thought he could have got it stopped." App. 17; 120.

**6.** Compare to: *Neptune Water Meter, supra*, at 572 (employee discharged 17 days after hired); *Firestone Tire, supra*, at 1338 (discharged em-

ployee "had been working a little over two months").

**7.** The ALJ also noted the "minor nature" of Sparks' offense when contrasted to his value to Petitioner as an employee, App. 19, but concluded that the general counsel had failed to establish pretext.

ty that Sparks would, as in the past, actively support such efforts.

■ The answer to Petitioner's second contention is that direct evidence on the ultimate issue is *not* necessary. Having considered all the evidence of record, we find that the Board's conclusion that discriminatory motive was a factor in Petitioner's decision is amply supported by substantial evidence. The Board demonstrated by affirmative and persuasive evidence that Sparks "would not have been discharged, though he may have been subjected to a milder form of punishment . . . except for the fact of his union activity." *Neptune Water Meter, supra,* 570.

Enforcement granted.

WIDENER, Circuit Judge, dissenting:

I respectfully dissent because I think the record is wholly devoid of any evidence connecting Sparks' union activity to his discharge, while his violation of a perfectly valid company rule is admitted.

Especially missing from the majority opinion is the company rule which Sparks violated and which I suggest the majority opinion infers (see esp. footnote 4, p. 319) does not exist. It is as follows:

> "Any employee having been found to have violated any of the following will be subject to discipline or discharge depending upon the circumstances in each situation:
>
> 4. Fighting, playing, gambling, indecent conduct or language while on duty or on company property."

As the Administrative Law Judge correctly points out in his opinion, Sparks admittedly had knowledge of this rule.

Sparks also admittedly violated the rule.

Sparks' last union activity known to the company or otherwise was more than six months prior to his discharge, and the other union activity with which Sparks was connected was some five years before his discharge. There was admittedly no union campaign going on in the plant at the time of Sparks' discharge.

Because these facts are correct beyond contradiction, the question of the motive behind the company's discharge of Sparks boils down to a question of the credibility of witnesses. The Administrative Law Judge who saw the witnesses and heard them testify credited the company's witnesses rather than drawing the strained inference taken by the Board in this case and upheld by the majority. Had there been other employees caught by a supervisor committing the same offense who had not been discharged, for example, the result might well be different, but there were none. Indeed, the only other evidence of an employee charged with indecent conduct (circulating an obscene drawing) showed that he escaped discharge only because he did not return to work after his 3–day suspension.

In summary, I would not enforce the order of the Board for the reasons set forth by the Administrative Law Judge in his fully documented and thoroughly analytical opinion, which is summarized in the following quotation from it:

> "The reasonableness of such restriction cannot be gainsaid. Management concern over the use of the outside premises as a restroom would thus provide a legitimate basis for disciplinary action. Given the reasonableness of the concern, union membership or support would not license an employee to urinate outside designated restroom areas any more than it would license him to urinate on the factory floor. [Footnote reference omitted]"