**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**BURNS MOTOR FREIGHT, INC., Respondent.**

No. 80–1047.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 6, 1980.

Decided Dec. 15, 1980.

R. Michael Smith, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate

Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Paul J. Spielberg, Deputy Asst. Gen. Counsel, Christopher W. Young, Student Intern on brief), Washington, D. C., for petitioner.

Johnson Kannady (George V. Gardner, Asa Ambrister, Gardner, Ambrister & Smith, Washington, D. C., on brief), for respondent.

Before BRYAN, Senior Circuit Judge, and RUSSELL and WIDENER, Circuit Judges.

PER CURIAM:

The National Labor Relations Board petitions for enforcement of its order directing Burns Motor Freight, Inc. (the Company) to reinstate driver William Martin as an employee and to make him whole for wages and benefits lost as a result of his discharge. In its order [1] the Board found that the Company terminated Martin's employment because of his prounion activities, in violation of National Labor Relations Act section 8(a)(3), 29 U.S.C. § 158(a)(3).[2] Concluding that the Board's findings are not supported by substantial evidence on the record considered as a whole,[3] we deny the petition for enforcement.

Burns Motor Freight is a trucking company with headquarters in Marlinton and a depot at Rupert, West Virginia. Martin worked as a driver at the Rupert facility from January 3 to August 18, 1978. On June 22 he was ticketed for driving a Company truck 81 m. p. h. in a 55 m. p. h. zone. Following apparent Company practice regarding speeding tickets, Martin paid his own fine. He did not report his violation to the Company, but dispatcher Kimberlin, the supervisor at Rupert,[4] heard of it the next day from Toth, one of the Rupert maintenance men. On July 26 Martin received a second, "double" ticket; this was for driving 69 m. p. h. and also for hauling an inadequately secured load. He presented this ticket to Supervisor Kimberlin who, after consulting with his superiors at the Marlinton office, informed Martin that the Company would pay for the load violation.

In early August, 1978 the Chauffeurs, Teamsters and Helpers Local Union No. 175, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the Union) commenced an effort to organize the employees at the Rupert facility. Martin apparently instigated this activity and prominently advocated the Union.

On August 10 the Union filed a petition with the NLRB for an election in a bargaining unit consisting of the truck drivers and mechanics at Rupert. A Union gathering was held on August 13. Two days later, Company Vice President Fred Burns, Jr. visited Rupert and met with 10 or more of the approximately 17 employees there. While interviewing employees singly and in small groups he clearly expressed his hostility to the Union and his determination to fight its establishment.[5] Martin revealed to Burns his participation in the Union movement during one of these meetings.

1. Burns Motor Freight, Inc., 246 N.L.R.B. No. 59 (Nov. 6, 1979).

2. That section declares it an unfair labor practice for an employer "by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." *Id.*

3. National Labor Relations Act section 10(e), 29 U.S.C. § 160(e), provides that, upon petition by the Board to any court of appeals for enforcement of its order, "[t]he findings of the Board with respect to questions of fact if supported by substantial evidence on the record considered as a whole shall be conclusive."

4. Kimberlin was found by the Board to be a supervisor. The testimony revealed that he was often the only supervisor present at the Rupert depot, and that he received orders and conveyed information to his superiors at Marlinton through frequent telephone and radio contact. No testimony was elicited as to whether or when he informed the Marlinton management of Martin's June 22 violation.

5. In its order the Board found that in these incidents, as well as in several others that took place after Martin's departure, the Company violated section 8(a)(1) of the Act. The Company does not contest these findings.

**314**

Three days after this encounter, on August 18, Company Director of Maintenance Larry Burns went to Rupert. On meeting Martin, he told him that he was suspended because of his July 26 speeding ticket. He intimated that after it had received and reviewed his driving record from the State, the Company would decide whether to reinstate him.

■ The Administrative Law Judge viewed this action as a discharge, commenting that "when a man is sent away for good he is discharged, no matter how the message be conveyed." We conclude that the evidence cannot support the finding that Larry Burns intended to discharge Martin on August 18. With this the testimony, including Martin's, accords: throughout their interview Larry Burns insisted, in the face of Martin's efforts to characterize it otherwise, that the action was a suspension pending a check of Martin's record.

■ Although the Company never recalled Martin, it is necessary to maintain the distinction between this ultimate result and the initial suspension. Both in the decision to suspend and in the decision not to recall, the Company acted with good cause.

Substantial evidence supports the ALJ's finding that the Burns brothers knew of Martin's 69 m. p. h. speeding ticket no later than July 28. At some point they also became aware of the earlier 81 m. p. h. violation, although it is unclear both when and what they knew of it. To have taken no action despite this knowledge would have been negligent; moreover, although

the Company's apparent delay of action may itself appear negligent and suggest an inference of improper motivation, it is a severe doctrine that would require the employer to extend and exacerbate its negligence in order to negate such an inference.[6]

After suspending Martin, the Company not only confirmed its information regarding his speeding, but also learned that Martin's motor vehicle record was, as a consequence of his violations, encumbered with nine "points". The proof indicates that such a record, amassed in such a short span of employment, was unusual and probably unique for a Company driver. Although Martin had not yet accumulated sufficient points to require forfeiture of his chauffeur's license, uncontradicted testimony by a representative of the Company's insurance agency disclosed that, once the underwriters were apprised of Martin's record, he would become virtually uninsurable.[7]

The Board has failed to maintain the burden that this Court has repeatedly demanded of it upon issues of this type:

[E]ven when there is evidence of anti–union animus, the Board must still affirmatively show that the discharges were improperly motivated.... If in fact there was no cause for discharge, there may well be an inference that the assigned reason was pretextual. But when cause exists, the Board must show an "affirmative and persuasive reason why the employer rejected the good cause and chose a bad one."

*NLRB v. Patrick Plaza Dodge, Inc.,* 522 F.2d 804, 807 (4th Cir. 1975) (quoting *NLRB*

**6.** It should be noted that Fred Burns, Jr. testified that he had requested Martin's record from the Department of Motor Vehicles before Larry Burns' August 18 trip to Rupert. James Fletcher, a representative of the Company's insurance agency, testified that motor vehicle reports generally are received three or four weeks after they are requested.

**7.** It is difficult to understand how the following colloquy, concerning insurers' reactions to a mere six points accumulated within a single year, could be brushed lightly aside:

Judge Ricci: This is not saying that they automatically cancel policies?

The Witness: No. They normally automatically want them terminated from the coverage under the insured's policy. If you have ten drivers and one driver is in this situation then they want to exclude him from coverage.

Judge Ricci: To say they want him off is one thing. Do they insist on qualifying the continuance of coverage that that man be taken off?

The Witness: Basically, that's what they're saying.

The Witness reiterated this point in later testimony, and testified as well that the other carriers represented by his agency operate under the same constraint.

*v. Billen Shoe Co.,* 397 F.2d 801, 803 (1st Cir. 1968)). *Accord, NLRB v. Appletree Chevrolet, Inc.,* 608 F.2d 988, 993 (4th Cir. 1979); *Firestone Tire and Rubber Co. v. NLRB,* 539 F.2d 1335, 1337 (4th Cir. 1976).

We need not consider whether the burden–shifting test recently adopted in *Wright Line, a Division of Wright Line, Inc.,* 251 N.L.R.B. No. 150 (Aug. 27, 1980), is more appropriate for dual motivation cases than the test applied in this Circuit. Even under *Wright Line* the Company has demonstrated that its actions would have been the same in the absence of Martin's protected conduct.

The Board's finding that Martin's discharge was traceable to his union activities is not, we hold, adequately undergirded by substantial evidence and for that infirmity it must fall.

Enforcement denied.